### G. M. GLENN v. SOUTHERN EXPRESS COMPANY.

(Filed 1 December, 1915.)

**1. Intoxicating Liquors—Interstate Commerce—Federal Regulation—Repealing Acts—State Laws.**

The Webb-Kenyon act, withdrawing from the protection of interstate commerce the shipment of intoxicating liquors where such are intended to be received in violation of the State law, etc., is a constitutional and valid law.

**2. Interstate Commerce—State Regulation—Police Powers.**

The Webb-Kenyon law does not confer upon the States any right or power to regulate interstate commerce, for the act itself is a regulation thereof, and it is not objectionable for want of uniformity arising from the differences in the State laws regarding the question of intoxicating liquors.

**3. Intoxicating Liquors—Police Powers—Constitutional Laws.**

The sale of intoxicating liquors affects the morals, health and sobriety of the people of a locality, and falls within the police powers inherent in a State, and which the States have not delegated in the Constitution to the Federal Government.

**4. Same—Personal Use—Interpretation of Statutes.**

Our statute, ch. 87, Laws 1915, enacted in accordance with the police powers and the declared public policy of the State with reference to prohibiting the manufacture and sale of intoxicating liquors, etc., is in accord with the Webb-Kenyon act of Congress, and not in violation thereof, prohibiting the carrier to transport and the consignee to receive more than one quart of intoxicating liquor within the period of fifteen days; and this position is not affected by the fact that certain consignees may want the liquor for their own personal use, it being within the power of the Legislature to prevent an evasion of the law by persons who may make such claims, but who, in fact, intend to violate the law by making sales or unlawful disposition of the liquor to others.

APPEAL by defendant from *Daniels, J.,* at May Term, 1915, of WAKE.

The plaintiff, G. M. Glenn, brought two suits against the Southern Express Company, one for the value of one quart of whiskey and damages for refusal to deliver same, and the other for a *mandamus* to compel the Southern Express Company to accept at Richmond, Va., a shipment consigned to the plaintiff at Raleigh, North Carolina, containing one gallon of whiskey. The questions of law involved in the two suits are the same, and they will be considered together.

FACTS IN THE ACTION FOR DAMAGES.

G. M. Glenn, a citizen of the State of North Carolina and a resident of Raleigh, on 5 April, 1915, ordered by United States mail, from H. Clarke & Sons, duly licensed liquor dealers in Richmond, Va., one quart of whiskey, and sent the order for this quart of whiskey, accompanied by $1.25, the purchase price thereof, from his residence in Raleigh,

N. C., to H. Clarke & Sons, and instructed them to ship one quart of whiskey to him at Raleigh. This order and the purchase price of the whiskey were received by H. Clarke & Sons, at Richmond, Va., by United States mail and the order was there accepted by them, and in pursuance thereof H. Clarke & Sons delivered the package of whiskey to the Southern Express Company at its office in Richmond, Va., marked with the name and address of G. M. Glenn as the consignee thereof, and with a statement showing the nature and quantity of the contents plainly marked on the outside cover of the package. The Southern Express Company accepted this package and transported it from its office at Richmond, Va., in the regular course of its business as a common carrier by express to Raleigh, N. C., and delivered it to G. M. Glenn on 7 April, 1915.

On 6 April, 1915, G. M. Glenn ordered by United States mail from H. Clarke & Sons another quart of whiskey and sent a similar order therefor, accompanied by the purchase price, from his residence in Raleigh, to H. Clarke & Sons at Richmond, and instructed them to ship this second quart of whiskey to him at Raleigh. This order and the purchase price of the whiskey were received by H. Clarke & Sons at Richmond, Va., by United States mail, and the order was there accepted by them, and in pursuance thereof they delivered a package containing one quart of whiskey to the Southern Express Company at its office in Richmond, Va., marked with the name and address of G. M. Glenn as the consignee thereof, and with a statement showing the nature and quantity of the contents marked plainly on the outside cover of the package, and paid the proper express charges for transportation of this package to G. M. Glenn, at Raleigh, N. C. The Southern Express Company accepted this package and transported it from its office at Richmond, Va., in the regular course of its business as a common carrier by express, to Raleigh, N. C. This package containing one quart of whiskey arrived at the office of the Southern Express Company at Raleigh, N. C., on 8 April, 1915, and G. M. Glenn appeared at the office on 8 April, 1915, and demanded the delivery thereof and was prepared to sign a book or any other receipt required by the Southern Express Company under the law, and the express company refused to deliver this package upon such demand.

The quart of whiskey contained in the first package, which was delivered to G. M. Glenn, and the whiskey contained in the second package, which the express company refused to deliver, were intended by Glenn for his personal use. At the time when Glenn ordered each of these shipments from H. Clarke & Sons he advised them that the whiskey was for his personal use, and on the outside of each of the packages the shippers marked, "For personal use of the consignee."

FACTS IN APPLICATION FOR WRIT OF MANDAMUS.

On 8 April, 1915, G. M. Glenn ordered by United States mail from H. Clarke & Sons, duly licensed liquor dealers in Richmond, Va., one gallon of whiskey and sent the order for this gallon of whiskey, accompanied by $2.85, the purchase price thereof, from his residence in Raleigh, N. C., to H. Clarke & Sons, at Richmond, Va., and instructed them to ship the said gallon of whiskey to him at Raleigh. This order and the purchase price of the whiskey were received by H. Clarke & Sons at Richmond, Va., by United States mail and the order was there accepted by them. On 10 April, 1915, H. Clarke & Sons, in pursuance of the acceptance of this order, tendered a package containing one gallon of whiskey, together with the regular scheduled charges for the transportation thereof from Richmond, Va., to Raleigh, N. C., to the Southern Express Company, at its office at Richmond, Va. This package was marked with the name and address of G. M. Glenn as the consignee thereof, and with a statement showing the nature and quantity of the contents plainly marked on the outside of the package. The whiskey contained in this package was for the plaintiff's personal use, and at the time it was ordered G. M. Glenn advised the shippers that the whiskey was for his personal use, and the package containing the whiskey was plainly marked on the outside, "For personal use of consignee."

The Southern Express Company refused to accept this shipment.

It was admitted that the Southern Express Company is a common carrier within the meaning of the act of Congress entitled "An act to regulate commerce," and the amendments thereto, and that the Southern Express Company is engaged in the business of a common carrier for hire on railroads operating through and between the States of Virginia and North Carolina and other States.

The defendant refused to deliver the quart of whiskey to the plaintiff and to receive the gallon of whiskey, contending that it was forbidden to do so by sections 1, 2, and 3 of ch. 97, Laws of 1915, which read as follows:

"SECTION 1. That it shall be unlawful for any person, firm or corporation, or any agent, officer or employee thereof, to ship, transport, carry or deliver, in any manner or by any means whatsoever, for hire or otherwise, in any one package or at any one time, from a point within or without this State, to any person, firm or corporation in this State, any spirituous or vinous liquors or intoxicating bitters in a quantity greater than one quart, or any malt liquors in a quantity greater than five gallons, and it shall be unlawful for any spirituous or vinous liquors or intoxicating bitters so shipped, transported, carried or delivered in any one package to be contained in more than one receptacle.

"SEC. 2. That it shall be unlawful for any person, firm or corporation at any one time, or in any one package, to receive at a point within

the State of North Carolina for his or her use or for the use of any person, firm or corporation, or for any other purpose, any spirituous or vinous liquors or intoxicating bitters in a quantity greater than one quart, or any malt liquors in quantity greater than five gallons.

"SEC. 3. That it shall be unlawful for any person, firm or corporation, during the space of fifteen consecutive days, to receive any spirituous or vinous liquors or intoxicating bitters in a quantity or quantities totaling more than one quart, or any malt liquors in a quantity greater than five gallons: *Provided,* that the provisions of sections one, two and three shall not apply to the receipt by a common carrier for transportation to a point in another State where delivery is not forbidden by the laws of such State."

Judgment was rendered in the first action denying the right of the plaintiff to recover, and in the second, refusing the writ of mandamus, and the plaintiff appealed.

*Lawrence Maxwell, Joseph S. Graydon and Murray Allen for plaintiff.*
*A. B. Andrews, Jr., for defendant.*

ALLEN, J. Prior to the enactment of the Webb-Kenyon law the refusal of the defendant to deliver the quart of whiskey, or to receive for shipment the gallon ordered by the plaintiff, could not have been upheld, as they would have been, on the facts in the record, interstate shipments for personal use (*R. R. v. Brewing Co.,* 223 U. S., 70), and it becomes necessary, therefore, to inquire into the effect of the act of Congress upon shipments of intoxicating liquors from one State to another.

The constitutionality of the Webb-Kenyon law has been sustained by this Court in *S. v. R. R.,* 169 N. C., 303, and in other jurisdictions where the question has been considered (*S. v. Doe,* 139 Pac. (Kan.); *Zinnerman v. Oregon,* 210 Fed., 378; *W. Va. v. Express Co.,* 219 Fed., 794; *Atkinson v. Express Co.,* 78 S. E., 516 (S. C.); *Express Co. v. Beer,* 65 So., 575 (Miss.); *S. v. Express Co.,* 145 N. W., 451 (Iowa); *Express Co. v. State,* 66 So., 115), and the history of legislation by Congress and the reasoning in the decided cases indicate that the Supreme Court of the United States will reach the same conclusion.

Prior to any legislation by Congress it was held in *Bowman v. R. R.,* 125 U. S., 465, that a statute of the State of Iowa was void which forbade a carrier from bringing into the State any intoxicating liquors without procuring the certificate required by the statute.

This was followed by *Leisy v. Harbin,* 135 U. S., 100, which not only recognized intoxicating liquors as a commodity which, when carried from State to State, was entitled to protection as interstate commerce, but also that this protection included the right to sell in the original package.

19—170

These decisions were not predicated upon the inability of Congress to legislate upon the subject, but on the ground that inasmuch as Congress had enacted no law restricting or regulating interstate commerce in intoxicating liquors, it was its desire that such commerce should be free and untrammeled.

This is clearly shown by the opinion in the last case, in which the Court says:

"Whenever, however, a particular power of the General Government is one which must necessarily be exercised by it, and Congress remains silent, this is not only not a concession that the powers reserved by the States may be exerted as if the specific power had not been elsewhere reposed, but, on the contrary, the only legitimate conclusion is that the General Government intended that power should not be affirmatively exercised, and the action of the State can not be permitted to affect that which would be incompatible with such intention. Hence, inasmuch as interstate commerce, consisting in the transportation, purchase, sale and exchange of commodities, is national in its character, and must be governed by a uniform system, so long as Congress does not pass any law to regulate it, *or allowing the State to do so,* it thereby indicates its will that such commerce shall be free and untrammeled"; and again, "Undoubtedly, it is for the legislative branch of the State Government to determine whether the manufacture of particular articles of traffic, or the sale of such articles, will injuriously affect the public, and it is not for Congress to determine what measures a State may properly adopt as appropriate or needful for the protection of the public safety; but, notwithstanding it is not vested with supervisory power over matters of local administration, the responsibility is upon Congress, so far as the regulation of interstate commerce is concerned, to *remove the restrictions upon the State in dealing with imported articles of trade within its limits,* which have not been mingled with the common mass of property therein, *if, in its judgment, the end to be secured justifies and requires such action.*" (Italics ours.)

These quotations are taken from the case (*Leisy v. Harbin*) that has gone furthest in rendering ineffective statutes enacted by the States to regulate or to destroy the traffic in intoxicating liquors, and the language is without meaning unless it was intended to convey the idea that inaction by Congress indicates a purpose that commerce shall be free and untrammeled, but that Congress has the power to remove the restrictions upon the State in dealing with imported articles of trade and to allow the States to pass laws regulating dealing in such articles, and this is all the Webb-Kenyon act purports to do, because the construction of that act is that it simply withdraws the protection of interstate commerce from intoxicating liquors when any such liquor is intended by any person interested therein to be received, etc., in violation of the law of

the State. *Express Co. v. Kentucky,* U. S. Supreme Court opinion filed 14 June, 1915.

To meet the decision in the *Leisy case,* the Wilson act of 1890 was passed by Congress, which provides: "That all fermented, distilled, or other intoxicating liquors or liquids transported into any State or Territory, or remaining therein for use, consumption, sale or storage therein, shall, upon arrival in such State or Territory, be subject to the operation and effect of the laws of such State or Territory, enacted in the exercise of its police powers, to the same extent and in the same manner as though such liquids or liquors had been produced in such State or Territory, and shall not be exempt therefrom by reason of being introduced therein in original packages or otherwise."

This last act was declared to be constitutional in *In re Rahrer,* 140 U. S., 545, but in the subsequent case of *Rhodes v. Iowa,* 170 U. S., 412, while adhering to the decision in the *Rahrer case* as to the constitutionality of the act, it was held that the language "upon arrival in such State" meant after delivery to the consignee.

Speaking of these two cases and of the Wilson act, the Court said in *Vance v. Vanderook Co.,* 170 U. S., 428: "In the first of these cases the constitutional power of Congress to pass the enactment in question was upheld, and the purpose of Congress in adopting it was declared to have been to allow State laws to operate on liquor shipped into one State from another, so as to prevent the sale in the original package in violation of State laws. In the second case the same view was taken of the statute, and, although it was decided that the power of the State did not attach to the intoxicating liquor when in course of transit, and until receipt and delivery, it was yet reiterated that the obvious and plain meaning of the act of Congress was to allow the State laws to attach to intoxicating liquors received by interstate commerce shipments before sale in the original package, and, therefore, at such a time as to prevent such sale if made unlawful by the State law."

In passing upon the enactment of the Wilson law in the case of *In re Rahrer,* the Court disposes of the objection to the Webb-Kenyon law that it is a delegation of power to the State, and that it is not a regulation of commerce because of want of uniformity, growing out of variations in the laws of the different States. The Court says: "In so doing Congress has not attempted to delegate the power to regulate commerce or exercise any power reserved to the States or to grant a power not possessed by the States or to adopt State laws. It has taken its own course and made its own regulation, applying to these subjects of interstate commerce one common rule, *whose uniformity is not affected by variations in State laws* in dealing with such property. . . . Congress did not use terms of permission to the States to act, but simply removed an impediment to the enforcement of the State laws in respect to im-

ported packages in their original condition, created by the absence of a specific utterance on its part. It imparted no power to the State not then possessed, but allowed imported property to fall at once upon arrival within the local jurisdiction."

The principles seemingly deducible from these authorities are:

1. That prior to any legislation by Congress the right to sell in the original package was inherent in the shipment of intoxicating liquors from one State to another, and this right could not be interfered with by the State.

2. That this right can be withdrawn by Congress.

3. That it is within the constitutional power of Congress to subject intoxicating liquors to laws enacted by the States in the exercise of the police power upon arrival in the State.

4. That an act of Congress subjecting intoxicating liquors to the police laws of the State upon arrival in the State is not a delegation or grant of power to the State.

5. That such an act of Congress is a regulation of commerce.

6. That the uniformity of the regulation by Congress is not affected by variations in the State laws.

7. That Congress has the power to remove the impediment of the protection of interstate commerce to the enforcement of State laws.

If so, the constitutionality of the Webb-Kenyon law has already been determined by the Supreme Court of the United States, and the fact that in the recent case of *Express Co. v. Kentucky* the opinion was based upon the construction of the act, treating it as valid, when the constitutional question was directly raised, gives color to the belief that that Court regards the question as settled. Indeed, there is no real difference except in degree between the Wilson act and the Webb-Kenyon law, as both subject intoxicating liquors to the police power of the State, the first, when the shipment is delivered to the consignee, and the second, when it reaches the borders of the State; and when it was held that the Wilson act was constitutional, and that it was in itself a regulation of commerce, it would seem that the question as to the validity of the Webb-Kenyon law was foreclosed, because, as was said in *Securities Co. v. United States,* 193 U. S.: "The power of Congress to regulate commerce among the States and with foreign nations is the power to prescribe the rule by which commerce is to be governed, . . . that a sound construction of the Constitution allows to Congress a large discretion with respect to the means by which the powers it confers are to be carried into execution, which enable that body to perform the high duties assigned to it, in the manner most beneficial to the people, and, if the end to be accomplished is within the scope of the Constitution, all means which are appropriate which are plainly adapted to that end and which are not prohibited, are constitutional."

This construction gives effect to the commerce clause of the Constitution and to legislation by the States, and is in accordance with the views of the founders of the Constitution, because, as was said in *Sherlock v. Alling,* 93 U. S., 99, and approved in *Plumly v. Massachusetts,* 155 U. S., 473, "In conferring upon Congress the regulation of commerce it was never intended to cut the States off from legislating on all subjects relating to the health, life and safety of their citizens, though the legislation might indirectly affect the commerce of the country."

If the Webb-Kenyon act is valid, it says in unmistakable language that the transportation of intoxicating liquors is prohibited when it is intended by any person interested to be received, etc., in violation of any law of the State into which the liquor is to be transported.

The consignee is a person interested in the shipment, and the statute of this State makes it unlawful to receive more than one quart of intoxicating liquors within fifteen days.

It follows, as the Webb-Kenyon law forbids the transportation of liquor when it is intended to be received in violation of the law of the State, and as the State statute forbids receipt, that receiving more than one quart in fifteen days is in violation of the law of the State, and therefore illegal, if the statute of the State is valid as an exercise of the police power.

This question was not decided, and, on the contrary, was expressly reserved, in *S. v. Williams,* 146 N. C., 618, the Court saying in that case: "We do not hold that common carriers may not be forbidden to transport liquor into prohibition territory. That question is not before us, nor do we undertake to express any opinion regarding the effect of the Fourteenth Amendment upon the power of the State to deal with the manner of sale of liquor or of the power of Congress to legislate upon the question of interstate transportation."

The police power is one originally and always belonging to the States, and was not surrendered by them to the General Government.

In *United States v. Knight,* 156 U. S., 1, it is said: "It can not be denied that the power of a State to protect the lives, health and property of its citizens and to preserve good order and public morals, the power to govern men and things within the limits of its dominion, is a power originally and always belonging to the States, not surrendered by them to the Government, nor directly restrained by the Constitution of the United States and essentially exclusive," and in *Jacobson v. Massachusetts,* 187 U. S., 11, speaking of the statute of Massachusetts, "The authority of a State to enact this statute is to be referred to what is commonly called the police power, a power which the State did not surrender when becoming a member of the Union under the Constitution."

"It is the power to protect the public health and the public safety, to preserve good order and the public morals, to protect the lives and prop-

erty of the citizens, the power to govern men and things by any legislation appropriate to that end." 9 Ency. of U. S. Reports, 473.

"This power is, and must be, from its very nature, incapable of any very exact definition or limitation; upon it depends the security of social order, the life and health of the citizens, the comfort of an existence in a thickly populated community, the enjoyment of private and social life, and the beneficial use of property." *Slaughterhouse cases,* 16 Wall., 36.

If it is a power which belongs to the State and has not been surrendered, and if it may be exercised to conserve the peace, health, morals and safety of the people, the question is presented whether the use of intoxicating liquors is so threatening to the public welfare that its regulation and control comes within the scope of the legitimate exercise of the power.

The courts have not always moved as rapidly as the enthusiast might desire, because restrained by law, but they have spoken in no uncertain terms of the evils growing out of the liquor traffic, and have been insistent as to the necessity for restriction and regulation in the use of intoxicants, as will be seen by reference to the following cases: *Goddard v. Jacksonville,* 15 Ill., 589; *Beebe v. State,* 6 Ind., 542; *S. v. Crawford,* 42 A. R., 186; *Thurlow v. Commonwealth,* 5 How. (Mass.), 504; *S. v. City Council,* 42 S. C., 222; *Crowley v. Christensen,* 137 U. S., 86.

We quote from only three of these cases, and then only for the purpose of illustrating the idea that the courts recognize the excessive use of intoxicants as injurious to health, morals and the public safety, and, therefore, that their sale and use may be controlled by the State under its police power.

The Court says, in *Thurlow v. Commonwealth:* "It is not necessary, for the sake of justifying the State legislation now under consideration, to array the appalling statistics of misery, pauperism and crime which have their origin in the use and abuse of ardent spirits."

In *Crowley v. Christensen,* 137 U. S., 86: "It still is the prolific source of disease, misery, pauperism, vice and crime. Its power to weaken, corrupt, debauch and slay human character and human life is not destroyed or impaired because it may be susceptible of some innocent uses, or may be used with propriety on some occasions. The health, morals, peace and safety of the community at large are still threatened, and, under the form of government established for this State, and for the Union of States of which it is a member, these are special subjects of local legislative cognizance."

In *S. v. City Council,* 42 S. C., 222 (20 S. E., 221): "We do not suppose there is a more potent factor in keeping up the necessity of asylums, penitentiaries and jails, and in producing pauperism and immorality throughout the entire country, than liquors."

The publications of the medical profession show that the members of that profession generally concur in this view.

If, as we have undertaken to show, the regulation of the use is within the scope of the police power, is the statute of the State a reasonable exercise of that power? The means to be adopted by the State are largely within the legislative discretion.

"Where the methods have been devised by the State under the power to protect the property of its people from injury and do not appear upon their face to be unreasonable, we must, in the absence of evidence showing the contrary, assume that they are appropriate to the object which the State is entitled to accomplish." *Reid v. Colorado,* 187 U. S., 137.

"While the courts must exercise a judgment of their own, it by no means is true that every law is void which may seem to the judges who pass upon it excessive, unsuited to its ostensible end, or based upon conceptions of morality with which they disagree. Considerable latitude must be allowed for differences of view as well as for possible peculiar conditions which this Court can know but imperfectly, if at all." *Otis v. Parker,* 187 U. S., 606.

In *Munn v. Illinois,* 94 U. S., 113, the Court said: "For our purposes we must assume that, if a state of facts could exist that would justify such legislation, it actually did exist when the statute now under consideration was passed. For us the question is one of power, not of expediency. If no state of circumstances could exist to justify such a statute, then we may declare this one void because in excess of the legislative power of the State. But if it could, we must presume it did. Of the propriety of legislative interference within the scope of legislative power, the Legislature is the exclusive judge."

If considered without regard to the policy of the State in favor of prohibition, we would hold it an arbitrary and unwarranted interference with the right of the carrier to transport, and with the right of the consignee to receive, but when it is understood that the statute is but a means of enforcing the State policy of prohibition there seems to be such a reasonable relation between the two as justifies upholding the statute as a reasonable regulation.

The State has declared that intoxicating liquors shall not be sold or manufactured within the State, and one of the principal difficulties in the enforcement of this law is the impossibility of distinguishing between liquors brought into the State for use and those introduced to sell, and the bringing in of such liquors under the pretense of being for personal use, when they are intended for sale, has been such a prolific source of evasion of the prohibition law that restrictions upon the right of delivery in the State are necessary to prevent illicit sales.

In *Mugler v. Kansas,* 123 U. S., the Court held that it was within

the power of the State to prohibit the manufacture of intoxicating liquors for one's own personal use, and, if this may be done, why may not the State limit the quantity which may be received for use?

In this last case (*Mugler v. Kansas*), after discussing the extent of the police power, the Court says, with reference to its application: "Keeping in view these principles, as governing the relations of the judicial and legislative departments of government with each other, it is difficult to perceive any ground for the judiciary to declare that the prohibition by Kansas of the manufacture or sale, within her limits, of intoxicating liquors for general use there as a beverage is not fairly adapted to the end of protecting the community against the evils which confessedly result from the excessive use of the ardent spirits. . . . And so, if in the judgment of the Legislature the manufacture of intoxicating liquors for the maker's own use, as a beverage, would tend to cripple, if it did not defeat, the effort to guard the country against the evils attending the excessive use of such liquors, it is not for the courts, upon their views as to what is best and safest for the community, to disregard the legislative determination of that question. So far from such a regulation having no relation to the general end sought to be accomplished, the entire scheme of prohibition, as embodied in the Constitution and laws of Kansas, might fail if the right of each citizen to manufacture intoxicating liquors for his own use as a beverage were recognized. Such a right does not inhere in citizenship. Nor can it be said that government interferes with or impairs any one's constitutional rights of liberty or of property when it determines that the manufacture and sale of intoxicating drinks for general or individual use as a beverage are or may become hurtful to society, and constitute, therefore, a business in which no one may lawfully engage. Those rights are best secured, in our government, by the observance, upon the part of all, of such regulations as are established by competent authority to promote the common good. No one may rightfully do that which the lawmaking power, upon reasonable grounds, declares to be prejudicial to the general welfare."

*Express Co. v. Whittle,* 69 So., 652, in which the opinion was filed 17 June, 1915, by the Supreme Court of Alabama, is directly in point upon the question before us. In that case the statute before the Court was, in all essential particulars, like ours. It provides in section 12, "That it shall be unlawful for any person, firm or corporation, (1) to receive or accept delivery of, or to possess or to have in possession at any one time, whether in one or more places, and whether in original packages or otherwise, more than one-half gallon of spirituous liquors, or more than two gallons of vinous liquors, or more than five gallons of malted liquors, when in kegs, or more than sixty pints when in bottles, or more than one gallon of any other intoxicating or fermented liquors

beyond those thus enumerated; or (2) to receive, accept delivery of, possess, or have in possession more than one gallon of spirituous liquors, or four gallons of vinous liquors or more than ten gallons of malted liquors, including beer and ale, when in kegs, or one hundred and twenty pints in bottles, or more than two gallons of any other fermented or intoxicating liquors beyond those enumerated, within any four consecutive weeks," and the Court, without dissent, held the statute to be valid and constitutional as applied to a shipment for personal use, saying, in conclusion, what is pertinent in passing on our statute, "If the right at common law to manufacture intoxicating liquor for one's own personal use, out of one's own materials by the application of one's own personal effort, may be forbidden by appropriate legislation under the police power, as was expressly ruled in *Mugler v. Kansas, supra,* it can not be logically or soundly asserted that the receipt or possession of more than a specified quantity at one time may not be forbidden by statute, especially when the sale or other disposition of intoxicants is forbidden in the State's effort to promote temperance and to suppress the evils of intemperance by visiting its power upon one of the means usually productive of intemperance, viz., the traffic therein, or, as has been before quoted from our *Marks* and *Carl cases, ante,* to remedy the evil present in 'the use of intoxicating liquors as a beverage.' The power confirmed in *Mugler v. Kansas* must necessarily comprehend the lesser manifestation of a like power by regulating the quantity to be received or possessed at one time in dry territory in the State. Furthermore, it would appear to be but the assertion of a self-evident truth to say that since one may be validly forbidden to sell his intoxicating liquors to another, that other may be validly forbidden to buy the article from him; and if one may be validly forbidden to sell and, necessarily validly forbidden to deliver the article, to another, that other may be validly forbidden to accept delivery. As to the seller, the prohibitions stated would operate upon him and upon his property, but not in the sense or with the effect of infringing any constitutional right or immunity (*Dorman's case, supra*); whereas in the latter case (the buyer) the prohibitions would operate in anticipation, qualifying his right, in the interest of the public welfare as determined by the authority (the lawmakers) with which the decision in such circumstances rests—to acquire a property interest in the article above a defined quantity at one time."

In 5 R. C. L., 778, the editor says: "Under the Webb-Kenyon act, however, it would seem that interstate transportation of intoxicating liquors has been subjected absolutely to the law of the place of consignment," and in Mod. Am. L., vol. 12, pp. 250-251: "The Webb act has not yet come before the Court. Although President Taft vetoed it on the ground of unconstitutionality, and, in the debates on its first and final

passage over the veto, similar objections were made in Congress, it seems that the act is valid. It does not have so much of the appearance of delegation of power as did the Wilson act. In fact, it is a direct regulation by Congress prohibiting certain shipments and transportation in interstate commerce into certain regions to be determined by local conditions. Uniformity of regulation is not necessary, and even if it were, the act operates alike everywhere under like conditions. . . .

"This law is quite sweeping, and, if constitutional, puts it completely within the power of a State to prevent the bringing in of intoxicating drinks. For example, not only can a State forbid 'boot-leggers' coming across the boundary afoot with liquor, but a resident of the State may be forbidden to bring a bottle of liquor home with him from outside the State."

We need not go this far to sustain the legislation of this State.

*Express Co. v. Kentucky, supra,* has no bearing on the validity of our statute, and is only important in so far as it is determinative of the meaning of the Webb-Kenyon law, the Court holding in that case as to interstate shipments that "such shipments are prohibited only when such person interested intends that they shall be possessed, sold or used in violation of any law of the State wherein they are received."

The Kentucky statute does not purport to deal with the consignee, who is the "person interested therein." It operates only on the carrier by forbidding delivery, and does not say that it shall be unlawful for the consignee to receive, use or possess, and it could not, therefore, be held that the consignee, "the person interested therein," intended that the liquors should be received in violation of the law of the State, and in this is to be found the marked distinction between the statute of Kentucky and our statute, which saves the latter from condemnation.

We are, therefore, of opinion the judgments in the two actions must be affirmed, as in the first the plaintiff is demanding the delivery of one quart of whiskey within fifteen days after the receipt of a similar package, and in the second is seeking to compel the transportation of more than one quart, both being condemned by the statute.

Affirmed.