BYRON J. ECCLES v. S. E. STONE, as Sheriff of Volusia County.

183 So. 628.
Division A.
Opinion Filed September 20, 1938.

114

*Walter H. Shelley, Grant & Luther* and *Talbot Whitfield, Jr.,* for Appellant;

*George Couper Gibbs,* Attorney General, and *Tyrus A. Norwood,* Assistant Attorney General, and *Murray Sams,* State Attorney, for Appellee.

*Hyman B. Sobol,* as *Amicus Curiae.*

BUFORD, J.—The appeal brings for review order of Circuit Court denying temporary restraining order sought to

restrain Stone as Sheriff from seizing certain coin-operated machines which the Sheriff proposed to seize as unlawful coin-operated devices denounced by Chapter 18143, Acts of 1937.

It is first contended that the machines are not such as to fall within that class of coin-operated machines condemned and prohibited by Chapter 18143, *supra*. The machines involved in this case are described in the bill of complaint as follows:

"That said machines consist of a rectangular box with a glass top and are operated in the following manner: a coin is deposited by the player which releases the operating mechanism so that small balls or marbles are made available for playing at the lower end of the table; one ball or marble at a time is deposited in front of a plunger, the plunger is pulled back by the player and upon being released strikes against the marble or ball in the same manner as a billiard ball; the marble or ball, upon being propelled by the plunger, travels around the face of the machine; the direction and speed of the marble is determined by the skill of the player in operating the plunger; the object of the game is to cause the marble or ball to roll into holes or to strike bumpers with the highest numbers, which are distributed over the face of the machine, so as to run up a high score, which score increases relative to the skill of the player; hazards also appear on the face of the machine in the form of small nails, springs and resilient rails; that said machines emit no money or slugs or any articles of any kind, nor do they pay off in any manner."

Then follows the further allegation:

"Nor are they adapted for use in such way that as a result of the insertion of any piece of money or coin such machine or game is caused to operate or may be operated and by reason of any element of chance or of other outcome of such operation unpredictable by him, the user may

receive or become entitled to receive any piece of money, credit, allowance or thing of value, or any check, slug, token or memorandum, whether of value or otherwise, which may be exchanged for any money, credit, allowance, or thing of value, or which may be given in trade, nor may the user secure additional chances or rights to use such machine; that said Plaintiff does not allow, permit or suffer said machines to be played for gaming or gambling purposes by any person or persons, for money or other valuable consideration; that there is no unpredictable outcome or element of chance involved in the Plaintiff's machines so far as the return of value for the coin inserted therein is concerned, for the reason that, for each insertion of a coin, each user receives identically the same thing and knows in advance what he is to receive, to-wit, an opportunity to try his skill for a certain amount of amusement."

The first quoted allegations show that the machines are of the same class and character as the "marble pin games" which we had under consideration in the case of Weathers v. Williams, as Sheriff, 182 Sou. 764, and as to which we said:

"Now, if the machine is *adapted* for use in such a way that by reason of the result of the operation as hereinbefore mentioned involving the element of chance and an unpredictable result, the user may become entitled to receive any money, thing of value or other things mentioned in the section, then the machine falls within the purview of Section 2 of the Act. The meaning of the word 'adapted' is important. Webster's New International Dictionary defines 'adapt' to mean 'to make suitable; to fit or suit; to adjust; to alter so as to fit for a new use; to render fit by changing to meet the demands of a new environment.'

"So, if we transpose the statute eliminating the word 'adapt' and insert 'to render fit' the language used would be:

'any machine or device is a slot machine or device within the provisions of this Act if it is one that is fit or *rendered fit* for use in such a way that as a result of the insertion of any piece of money, or coin or other object, such machine or device is caused to operate or may be operated,' etc.

"It appears to us that there can be no serious question but that the machines described are by the operation thereof rendered fit for the determination by the element of chance and unpredictable result to entitle the player to receive a pay-off or wager and that, therefore, the third element exists in the machine which brings it within the purview of the statute and makes it obnoxious to paragraph (a) of Section 1 of the statute. So operating the machine would bring the operation within purview of paragraph (b) of Section 1 of the statute and would bring those participating in such operation within the purview of that paragraph of Section 1."

The latter quoted allegations which are mere conclusions not in harmony with the description of the operation of the machine are not sufficient to show that the machines are not such as are *"adapted"* for use in such a way that by reason of the result of the operation as hereinbefore mentioned involving the element of chance and an unpredictable result, the user may become entitled to receive any money, thing of value or other things mentioned in the section," or that they are not "by the operation thereof rendered fit for the determination by the element of chance and unpredictable result to entitle the player to receive a pay-off or wager," These elements are clearly shown to exist by the allegations describing the operation and the registration of the score automatically resulting from the operation which score is largely, if not entirely, the result of chance and absolutely unpredictable by the player or anyone else.

So we hold that the machines involved come within those described by Chapter 18143, *supra*.

It is next contended that if the provisions of Chapter 18143, Acts of 1937, are applicable to the machines involved in this case the Act in so far as it applies to such machines is null and void because it violates the provisions of Sections 1 and 12 of the Declaration of Rights of the Constitution of Florida and the Fourteenth Amendment of the Federal Constitution.

The validity of the Act rests upon the prerogative of the Legislature to enact laws in the exercise of the police power of the State.

"The police power of the State inheres in its sovereignty and is subject only to applicable provisions of the Federal and State Constitutions designed to protect private rights from arbitrary and oppressive governmental action." Everglades Sugar & Land Co., etc., v. Bryan, *et al.*, 81 Fla. 75, 87 Sou. 68.

"The possession and enjoyment of all rights are subject to the police power, and property of every kind, including contract rights, and rights in things intangible as well as tangible, is held subject to general regulations which are necessary for the common good and general welfare." State, *ex rel.*, *et al.*, v. Rose, *et al.*, 97 Fla. 710, 122 Sou. 225. See also Whitaker v. Parsons, 80 Fla. 352, 86 Sou. 247.

There are two rules which must be observed when courts are called upon to determine the constitutionality of statutes. The first is that if there is any doubt as to the constitutionality of the Act such doubt must be resolved in favor of its validity. The second rule is that in the exercise of the police power the sovereignty may enact such laws as are needful to protect certain inalienable rights of the public among others that are of good morals.

In arriving at a conclusion as to whether or not legislation enacted in the exercise of police power is needful for the protection of the moral welfare of the community, the courts should look to the history back of the legislation and should take notice of those things which are of common knowledge throughout the country. A short bit of history behind the enactment of Chapter 18143, *supra,* is that in recent years legislation in Florida tended toward the relaxation of statutes prohibiting gambling. That tendency reached its peak when the Legislature of 1935 legalized the operation of all sorts of slot machines or coin-operated gambling devices. The Act provided that the operation of such devices could be stopped in any county by a majority vote of the electors under prescribed conditions. Within two years the operation of slot machines in Florida had become so obnoxious to the citizens of this State that the people of a great majority of the counties in the State had voted overwhelmingly to prohibit the operation of all slot machine devices licensed under the 1935 Act being operated thereafter in their respective counties, and a great majority of the members of the Legislature of 1937 were pledged to their constituency to enact laws which would abolish the operation of slot machines in Florida. The opposition to slot machines was the direct result of the baneful and destructive effect which the operation of those machines had had upon the morals of the people of Florida of all ages and classes. It is a matter of common knowledge, of which we must take judicial cognizance, that the lure to play the slot machine had become so great as to undermine the morals of many and lead to the commission of or the indulgence in vices and crime to procure the coins with which to play the machines.

So the Legislature of 1937 carried out the mandate of the majority of the people of the State, and the members

their pledges to their constituency, to pass Acts which would prohibit the operation of coin-operated gambling devices in this State and enacted Chapter 18143.

It is also a matter of common knowledge that pursuant to the passage of that Act the popular slot machine with its set of pictured wheels, its alluring jack-pot and its pull lever, generally known as the one-armed bandit, faded away from the public places and immediately in the places where they had stood were set up the mechanical horse races, marble pin games and other coin-operated mechanical devices, adapted and fit for fast, easy gambling; and it is a matter of common knowledge, of which we cannot plead ignorance, that these machines are generally used as gambling devices and that the gambling element is the principal lure which causes them to be played by the public.

In the case of Calcutt v. McGeachy, Sheriff, 213 N. C. 1, 195 S. E. 49, the Supreme Court of North Carolina had under consideration an Act to prohibit the manufacture, possession and use of slot machines, gambling apparatus and devices. The opinion in this case quotes Section 3 of that Act which, among other things, denounces and makes unlawful the manufacture, sale, possession or use of just such machines as are described in the bill of complaint in this case. In that opinion the Court said:

"Enactments having for their object the suppression of gambling are within the legislative scope of police power. 12 C. J. 918.

" 'It has long been the practice in this country for the Legislature of the State * * * to pass laws prohibiting and punishing any practice or business the tendency of which, as shown by experience, is to weaken or corrupt the morals of those who follow it, or to encourage idleness instead of habits of industry, and to prohibit and punish gambling in the various forms in which it is practiced. Such regula-

tions, when not in conflict with general laws, or with the Constitution * * * under which they are enacted, are universally upheld by the courts.' *Ex Parte* O'Shea, 11 Cal. App. 586, 105 P. 776, 777.

"In Thomas v. Sanderlin, 173 N. C. 329, 91 S. E. 1028, 1029, Hoke, J., said: 'It has been properly said that no adequate or satisfactory definition of police power can be given; for, as our civilization and social conditions become more advanced and complex, the extent and inclusive character of this power is being more and more illustrated, and in the later decisions has been held to embrace, not only governmental regulations appertaining to the good order, health and morals of a community, but also such as are considered promotive of its economic welfare · and public convenience and comfort.' Quoting from 6 R. C. L 193, he continues: 'All property is held subject to the general police power of the State so to regulate and control its use in a proper case as to secure the general safety the public welfare, and the peace, good order and morals of the community. Accordingly, it is a fundamental principle of the constitutional system of the United States that rights of property, like all other social and conventional rights, are subject to such reasonable restraints and regulations established by· law. as the Legislature, under the governing and controlling power vested in it by the Constitution, may think necessary and expedient.'

" 'The presumption is that the Legislature has done its duty and that an Act passed by it is not in conflict with the Constitution. * * * Again, the courts will not adjudge legislative Acts invalid unless their violation of the Constitution be clear, complete and unmisakable.'

"Stacy, C. J., in Person v. Doughton, 186 N. C. 723, 120 S. E. 481, citing Bonitz v. School Trustees, 154 N. C. 375, 70 S. E. 735; Coble v. Com'rs, 184 N. C. 342, at page

348, 114 S. E. 487; also citing the case of Adkins v. Children's Hospital, 261 U. S. 525, 43 S. Ct. 394, 396, 67 L. Ed. 785, 24 A. L. R. 1238, in which the U. S. Supreme Court said:

" 'The judicial duty of passing upon the constitutionality of an Act of Congress is one of great gravity and delicacy. The statute here in question has successfully borne the scrutiny of the legislative branch of the government which, by enacting it, has affirmed its validity, and that determination must be given great weight. This Court, by an unbroken line of decisions from Chief Justice Marshall to the present day, has steadily adhered to the rule that every possible presumption is in favor of the validity of an Act of Congress until overcome beyond rational doubt.'

"In State v. Brockwell, 209 N. C. 209, 183 S. E. 378, 379, Connor, J., speaking to the power of the courts when validity of a statute is challenged, said: 'In the exercise of this power and in the performance of this duty it is a recognized principle uniformly applied that the courts will not adjudge that a statute is void on the ground that its enactment was in violation of a constitutional limitation, unless it so appears beyond a reasonable doubt.'

"In Glenn v. Express Co., 170 N. C. 286, 87 S. E. 136, 141, L. R. A. 1918B, 438, speaking to the question of the constitutionality of a statute which made it unlawful for any person, firm or corporation to ship, transport, carry, or deliver for hire, or otherwise, whisky, Allen, J., said: 'If considered without regard to the policy of the State in favor of prohibition, we would hold it an arbitrary and unwarranted interference with the right of the carrier to transport, and with the right of the consignee to receive; but when it is understood that the statute is but a means of of enforcing the State policy of prohibition there seems to be such a reasonable relation between the two as justifies

upholding the statute as a reasonable regulation.' Skinner v. Thomas, *supra.*

"In the instant case, when considered in the light of a State policy of suppressing and prohibiting gambling, there is reasonable relation between a coin-operated slot machine in the playing of which the operator may make varying scores or tallies upon the outcome of which wagers may be made, and those so operated which may give a return of something of value which is unknown to, or unpredictable, by the operator. The element of chance is present. This justifies sustaining the statute as a reasonable regulation, and within the police power vested in the Legislature."

Our State policy has for many years been against all forms of gambling, with the exception of the legislative enactment legalizing parimutuel wagers on horse racing and the 1935 Act legalizing the operation of slot machines.

In 11 American Jurisprudence 1024, it is said:

"A cardinal principle involved in the exercise of the police power establishes the well settled rule that the police power may be exerted to preserve and protect the public morals. Therefore, any practice or business, the tendency of which as shown by experience, is to weaken or corrupt the morals of those who follow it or to encourage idleness instead of habits of industry is a legitimate subject for regulation or prohibition by the State.

"A great many situations arise in the complexity of modern society in which the police power is invoked for the purpose of preventing vicious practices. On this principle it is concededly within the police power of the State to suppress gambling in all its forms, including hore racing. wagering of all kinds, such as bookmaking and pool selling, keeping pool tables for hire, lotteries, buying and selling stocks on margin, and dealing in options or futures. Fur-

thermore, to suppress gambling the State may provide that the owner of a building in which gambling is conducted who knowingly looks on and permits such gambling, can be made liable in his property which is thus used to pay a judgment against those who won the money."

And on page 1026, it is said:

"The exercise of police measures under the head of conserving public morality is only valid where the matter sought to be regulated actually affects the public morals. This test governs in determining the validity of regulation of simple games. The fact that a game has attractions which induce players to practice it does not change its character to one of amusement or entertainment provided for the public; and if it is a game of a healthful and harmless nature, such as golf or lawn tennis, it is not a subject for the exercise of police power. Miniature golf courses, however, have been held to be subject to regulation on the theory that they not only are partially of the nature of an amusement, but cause congestion and other conditions affecting the public interest."

In Colbert, Sheriff, etc., v. Superior Confection Co., 154 Okla. 28, 6 Pac. (2d) 791, the syllabus of the Court is:

"Under the provisions of Section 1941, C. O. S., 1921, any person who sets up, operates or conducts, or who permits to be set up, operated or conducted in or about his place of business, whether as owner, employee or agent, any slot machine for the purpose of having or allowing the same to be played by others for money, property, checks, credits or any representative of value, shall be deemed guilty of a misdemeanor, and upon conviction shall be punished by a fine of not less than $25.00, nor more than $100.00, or by imprisonment in the county jail for a term of not more than thirty days, or by both such fine and imprisonment; and, under those provisions, it is immaterial

whether property or checks for which the machine is played, are of any value, or whether or not the machine is a gambling machine; the intent of the Act being to prohibit the playing of the machine, without regard to the value of property, or checks received from the playing thereof, and without regard to whether or not the machine is a gambling machine.

"A slot machine played with nickels that delivers a package of mints of the reasonable value of five cents when played with nickels, and sometimes delivers, in addition to the mints, checks varying from one to twenty in number which may be used for the further playing of the machine without profit and for the amusement of the player only, is within the provisions of Section 1941, C. O. S. 1921. The officers of the law may not be enjoined by a district court from enforcing the applicable statutes of Oklahoma providing a punishment for violation of the statutes of Oklahoma."

In the case of Hurvich v. State, 230 Ala. 578, 162 Sou. 362, in which the Supreme Court of Alabama had under consideration suit in equity to declare a slot machine contraband and to be destroyed pursuant to the power contained in the legislative Act approved July 25, 1931, the Court said:

"Appellant contends that it is not subject to condemnation and destruction because it is not shown ever to have been used for gambling, and that he himself was a dealer in such machines, and not an operator, and had no purpose ever to operate it.

"Section 3 of the Act (page 807) makes it 'unlawful for any person * * * to possess, keep, own, set up, operate or conduct, or permit to be set up, operated or conducted, any gambling device described in Section 1 of this Act, at any place whatsoever.' Section 6 (page 808) provides that it

shall be the duty of the solicitor to file a bill in equity pray-
ing that the device be forfeited and destroyed, and the
cause shall proceed and be determined as near as may be
as in cases for the forfeiture and destruction of contraband
liquors, conveyances and vehicles transporting prohibited
liquors. The latter proceedings are set forth in Sections
4775, 4776, 4777, 4778, Code. They have been held con-
stitutional (House and Lot v. State, 204 Ala. 108, 85 So.
382, 10 A. L. R. 1589), and so has the Act here in question
(Blackwell v. State [Ala. Sup.] 162 So. 310).

"We have shown that our statute uses the words "pos-
sess' and 'own' as well as 'keep,' 'set up,' 'operate' and 'con-
duct.' Some of the authorities hold that to 'keep' in con-
nection with 'set up' and 'operate' does not exist unless the
machine is set up or kept for operation by him who is so
charged. Haycraft v. Commonwealth, 243 Ky. 568, 49
S. W. (2d) 314; see also Ownes v. State, 52 Ala. 213;
Harris v. State, 31 Ala. 362; Id., 33 Ala. 373. Others hold
that it includes the mere possession or ownership without
proof of an intent to use for gambling purposes. Bobel v.
People, 173 Ill., 19, 50 N. E. 322, 324, 64 Am. St. Rep.
64. It was there said: 'And we are of the opinion that
it was the purpose of the Legislature in enacting this stat-
ute, not only to suppress the use of these gambling devices,
or the keeping of them for gambling purposes, but also to
prohibit the ownership or the keeping of them, whether for
gambling purposes or not; otherwise, why make it a criminal
offense to own or keep them without qualification as to the
purpose of such ownership or keeping, and why provide
for their seizure and destruction,'

"That, we think, is what was intended by the language
of our statute, whose words, in this connection, we have
quoted. We think it is clear that for the purpose of pre-
venting the use of a device for gambling the Legislature

may prohibit its possession or ownership, when it is designed for that purpose. The statute does not make its intended use for gambling a prerequisite."

And, further, it is said:

"The constitutional right which counsel suggest in brief is here violated is the due process provision, in that mere ownership or possession of a gambling device without an intention by the possessor to operate or conduct it, or permit it to be done, is property which cannot be condemned without just compensation. But the right here exercised is not that of eminent domain, but the police power of the State, by which it may, without compensation to the owner, cause the destruction of property (not take it for use), which is declared valid legislation proper to promote the health, morals, or safety of the community, so that the owner is sufficiently compensated (though compensation is not necessary) by sharing in the general benefits resulting from the exercise of such power. Mugler v. Kansa, 123 U. S. 623, 8 S. Ct. 273, 31 L. Ed. 205."

The contention is made in the brief that the Act is invalid because it makes unlawful the mere possession of the machine. The appellant is not in position to present this question and we are not now called upon to determine, and do not determine, whether or not the provisions of the Act can be constitutionally applied to one who keeps one or more of such machines as are involved here in his private residence for his own amusement, or to one who possesses and keeps one of such machines stored away in a private place. That question is not presented in this case. Here the appellant, in his bill of complaint, shows that the machines involved in this suit are set up in such locations as he has seen fit to place them and are offered to the public for the purpose of being played by the public; that the operation of the machines by him constitutes a commercial

enterprise for which he claims he has been granted a license upon the payment of a fee therefor. Therefore, he is not in the position of a mere possessor or owner, but is in the position of one who is using the property involved for commercial purposes and comes within the constitutional ban of the legislative Act.

The order appealed from is affirmed and the cause remanded to the lower court with directions to dismiss the bill of complaint.

ELLIS, C. J., and TERRELL, J., concur.

WHITFIELD, P. J., and BROWN and CHAPMAN, J. J., concur in the opinion and judgment.