ANTONIO MARASSO, *Plaintiff in Error*, v. J. C. VAN PELT, AS SHERIFF OF ESCAMBIA COUNTY, FLORIDA, *Defendant in Error*.

Opinion Filed April 19, 1919.

The provision of Chapter 7736, Laws of Florida, approved December 7, 1918, making it unlawful for any person to have in his possession, custody or control in this State any alcoholic or intoxicating liquors or beverages, except that any person over the age of twenty-one years may possess in such person's *bona fide* residence, for the personal use of himself or herself, and family, not exceeding four quarts of distilled alcoholic or intoxicating liquors or beverages and twenty quarts of malt or fermented alcoholic or intoxicating liquors or beverages, does not violate Section 1 of the Declaration of Rights or Article XIX of the State Constitution as amended and made effective on January 1, 1919.

A writ of Error to the Circuit Court for Escambia County; A. G. Campbell, Judge.

Judgment affirmed.

BROWNE, C. J., and TAYLOR J., dissent.

*Phillip D. Beall* and *John S. Beard*, for Plaintiff in Error;

*Van C. Swearingen*, Attorney General, and *C. O. Andrews*, Assistant, for the State.

WHITFIELD, J.—The plaintiff in error was taken into custody by the sheriff on a warrant issued under an information which in effect charges in one count that on

January 14, 1919, he and two others unlawfully held in their possession more than four quarts of alcoholic liquors each, to-wit, thirty-six gallons, and in a second count that on the same day they unlawfully held in their possession more than four quarts of alcoholic beverages each, to-wit, twenty-three gallons of wine. The information is predicated upon a portion of Chapter 7736 Acts of Special Session of 1918.

Marasso sought a discharge from custody in *habeas corpus* proceedings upon the ground that the statute upon which the information is predicated violates Section 1 of the Declaration of Rights and Article XIX of the State Constitution as amended.

The Circuit Judge remanded the petitioner and allowed him a writ of error to this court, which was taken under the statute, Section 2257, General Statutes, 1906, Florida Compiled Laws, 1914.

The constitution contains the following provisions.

"All men are equal before the law, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing and protecting property, and pursuing happiness and obtaining safety."

"Section 1. The manufacture, sale, barter or exchange of all alcoholic or intoxicating liquors and beverages, whether spiritual, vinous or malt, are hereby forever prohibited in the State of Florida, except alcohol for medical, scientific or mechanical purposes, and wine for sacramental purposes; the sale of which alcohol and wine for the purposes aforesaid, shall be regulated by law.

"Sec. 2.   The Legislature shall enact suitable laws for the enforcement of the provisions of this article.

"Sec. 3.   This article shall go into effect on the first day of January, A. D., 1919."   Article XIX State Constitution as amended at the election held November 5, 1918. See pages 323 and 324 Volume 1, Laws of 1917.   This article qualifies the provisions of Section 1 of the Declaration of Rights in so far as the provisions of the two may conflict.

Chapter 7736, Laws of Florida, approved December 7, 1918, to become effective January 1, 1919, makes it unlawful "for any person * * * to have in his * * * possession, custody or control in this State any alcoholic or intoxicating liquors or beverages, except (that) nothing contained in this Act should be construed to make it unlawful for any person over the age of twenty-one years to possess, have in custody or control, in such person's bona fide residence, for the personal use of himself or herself, and family, and not to be disposed of to any other person in any way, not exceeding four quarts of distilled alcoholic or intoxicating liquors or beverages and twenty quarts of malt or fermented alcoholic or intoxicating liquors or beverages, either or both."   Punishments are prescribed for violations of the statute.

It is in effect contended that the quoted provision of the statute violates Article XIX as amended, in that the provision of the article *prohibiting* the manufacture, sale, barter or exchange of alcoholic or intoxicating liquors and beverages, with stated exceptions, by implication withholds from the legislature the power to *regulate the possession* of such liquors and beverages under the rule of *expressio unius est exclusio alterius;* and that the stat-

ute violates the organic right to acquire, possess and protect property secured by Section 1 of the Declaration of Rights.

The principle of the rule contained in the maxim *expression unius est exclusio alterius* can properly be applied only to effectuate the intent of the law-making power. It should never be applied to defeat the manifest purpose and intent of a provision of law. Article XIX as amended is an exercise of the police power of the State by the people themselves, prohibiting "the manufacture, sale, barter or exchange of all alcoholic or intoxicating liquors and beverages, whether spirituous, vinous or malt, * * * except alcohol for medical, scientific or mechanical purposes, and wine for sacramental purposes;" and it commands the legislative duties to *regulate by law* such limited sales of alcohol and wine as are permitted and to "enact suitable laws for the enforcement of the provisions of this article." As it expressly commands the enactment of suitable laws to enforce its provisions, obviously the article has not "exhausted" the police powers of the State " in the premises. An express command to exercise one power does not by implication abrogate other police powers, particularly when the exercise of the other powers accords with the one commanded. See State v. Kane, 15 R. I. 395, 6 Atl. Rep. 783.

Organic limitations upon the authority of the legislature to exercise the police power of the State, in the enactment of statutory regulations of property rights in the interest of the general welfare, should not be implied by invoking the rule of construction *expressio unius est exclusio alterius* or otherwise, unless it is necessary to do so in order to effectuate some express provision of the constitution. An implied limitation upon the legisla-

tive power to regulate the possession of intoxicating liquors would tend to defeat rather than to effectuate, the *express* provisions of Article XIX. The command for the enactment of suitable laws to enforce the Article excludes implied limitations upon the legislative power in the premises.

Article XIX ordains stated prohibitions and permits stated sales with express commands for legislative action to enforce the Article. The statute prescribes no prohibitions, but enacts regulations suitable to enforce the organic prohibitions as expressly commanded by the Article itself. Therefore, the rule, *expressio unius est exclusio alterius* is not applicable, and the courts should not by construction imply a limitation upon the legislative power of regulation where manifestly none was intended. See State v. Weiss, 84 Kan. 165, 113 Pac. Rep. 388, 36 L. R. A. (N. S.) 73; State v. Durien, 70 Kan. 13, 80 Pac. Rep. 987, 15 L. R. A. (N. S.) 925. A contrary decision in State v. Gilman, 33 W. Va. 146, 10 S. E. Rep. 283, has been qualified and explained in State v. Sixo, 77 W. Va. 243, 87 S. E. Rep. 267. See also State v. Tincher, 81 W. Va. 441, 94 S. E. Rep. 503; Pine v. Com. — Va. —, 93 S. E. Rep. 652.

The sovereign police power of the State extends to all matters that affect the individual and collective welfare of the people; and being universal, it is potentially applicable to all the environments and activities of human life in the family home as well as in the business and public places. The manner and extent of the exertion of the sovereign power of the State are determined and regulated by constitutional provisions and by legislative enactments not in conflict with organic law. The exercise of the police power necessarily curtails the free use and enjoyment

of personal and property rights; but this is essential in regulations to conserve and promote the general welfare; and reasonable and appropriate exertions of the police power do not violate personal or property rights secured by the constitution, such rights being subject to the fair exercise of the police power of the State. This principle is consistent with Section 1, Declaration of Rights above quoted. The exercise of the police power of the State cannot be stayed by the acquisition of property that is subject to such power. Barbour v. Georgia, U. S. Supreme Court, April 14, 1919.

Statutory regulations under the police power of the State, whether affecting persons or property, or both, are vitally essential to the efficiency of sovereign government; and, when duly enacted, such regulations should be enforced by the courts unless they inevitably violate some express provision of the Federal or State Constitution; mere questions of policy or wisdom, necessity or expediency are foreclosed to the courts by the enactment of the regulations by the lawmaking power. Noble v. State, 68 Fla. 1, 61, South. Rep. 153; St. Louis &c. v. City, U. S. Sup. Ct., March 24, 1919.

If organic regulations of the sale of intoxicating liquors do not forbid statutory regulations of the *serving* of such liquors as was held in Van Pelt, Sheriff v. Hilliard, 75 Fla. 792, 78 South. Rep. 693, then a *fortiori* organic provisions *prohibiting* the manufacture, sale, barter or exchange of intoxicating liquors do not forbid statutes *regulating the possession* of such liquors, particularly when the constitution expressly requires the enactment to enforce the stated prohibitions.

If statutory regulations forbidding the sale of non-intoxicating beverages may aid in preventing the unlawful sale of intoxicating liquors, and are therefore valid under the police power of the State, as was held in Fine v. Moran, 74 Fla. 417, 77 South. Rep. 533, then statutory regulations of the quantity of alcoholic or intoxicating liquors that a person may have in possession certainly should be valid under the express organic command to "enact suitable laws for the enforcement of" Article XIX, and as tending to prevent the unlawful manufacture, sale, barter or exchange of such liquors.    See State v. Reno, —— Nev. —, 178, Pac. Rep. 902.

If a law has a real relation to the subject of Article XIX as amended, whether it is "suitable" is determined by its enactment, and the courts have no power of review. It is manifest that the provision of the statute regulating the possession of intoxicating liquors is appropriate and suitable to enforce the organic provisions forbidding the manufacture, sale, barter or exchange of intoxicating liquors, since possession may be an incident to unlawful manufacture, sale, barter or exchange; and the regulations of the possession necessarily tend to prevent the unlawful manufacture, sale, barter or exchange of such liquors.

The statute may not be necessary to prevent a vast majoity of the people of the State from violating Article XIX, but the legislature obviously regards it as appropriate to prevent some persons from making unlawful sales, barter or exchange of intoxicating liquors; and the law must apply generally as do other statutes defining and punishing crimes, the legislature having power to impose penalties for violations of statutory provisions.

It is not essential to the validity of the statute that it should regulate the possessoin of intoxicating liquors *only*

when the possession is *with intent to unlawfully* manufacture, sell, barter or exchange such liquors, since *all suitable* laws are contemplated by the organic provisions; and to limit regulations to possession with intent to violate. Article XIX may render the law ineffectual to enforce the Article, the legislative judgment in this regard not being reviewable. Unlawful or evil intent is not essential to all regulations of personal rights.

Suitable laws to enforce the provisions of Article XIX are expressly required by the constitution. This statute is of that nature and consequently it does not violate, but is in accord with, Article XIX. The rights secured by Section 1, Declaration of Rights are necessarily qualified by Article XIX as amended, each being a part of the organic law, and each relating to personal rights.

Whether the organic provisions securing the right to acquire, possess and portect property, means that such right is not transferable even with the possessor's consent, or that it may not be taken away without the possessor's consent, the provision of the statute involved in this case does not violate the secured right since it does not purport to transfer or to take away any "inalienable" right, but in order to enforce the organic law and to conserve the general welfare, the provision merely regulates the right of possession of intoxicating liquors, "the manufacture, sale, barter or exchange" of which is forbidden by the constitution. As the statutory provision enacted pursuant to an organic command reasonably regulates, under the police power, the possession of intoxicating liquors, and as it does not so restrict the possession as to amount to prohibition of possession and use, it does not violate the organic right to acquire, possess and protect property. See State v. Brooken, 19 N. M. 404, 143 Pac.

Rep. 479, L. R. A. 1915B, 213, Ann. Cas. 1916D 136, and authorities cited; Cason v. Florida Power Co., 74 Fla. 1, 76 South. Rep. 535, L. R. A. 1918A 1034; State *ex rel.* Simpson v. Ackerly, 69 Fla. 23, 67 South. Rep. 232; Dutton Phosphate Co. v. Priest, 67 Fla. 370, 65 South. Rep. 282; King Lumber & Mfg. Co. v. Atlantic Coast Line R. Co., 58 Fla. 292, 50 South. Rep. 509; Noble v. State, 68 Fla. 1, 61, South. Rep. 153.

If forbidding absolutely the possession of such liquors in places other than *bona fide* residences does not violate oganic rights, and serves to enforce commanded prohibition, as appears to be conceded in the briefs for the petitioners, then a statutory restriction of the quantity of such liquors that may be possessed in *bona fide* residences is within the power of the legislature to enact *pursuant to the express organic duty* to provide "suitable laws to enforce" the organic prohibitions of the manufacture, sale, barter or exchange of such liquors and such regulations do not violate organic property rights. The authority of the lawmaking power extends to residences as well as to other places; and statutory regulations not forbidden by the contitutions are the law of the land not subject to judicial review or approval.

Property rights may not exist in all things that are potentially capable of ownership. The subjects of property may be restricted and rights therein may be qualified, regulated, or prohibited by law. Rights of property in things that affect the general welfart, may by statutes be qualified, regulated or prohibited, without violating the organic "right of acquiring, possessing and protecting property," when the statutes are not arbitrary and oppressive in their nature or operation.

The statutory provision here considered does not destroy or prohibit the right to possess intoxicating liquors, but regulates the possession thereof in accord with the express requirement of the constitution and is an appropriate exercise of the police power of the State, therefore, it does not violate any property right secured by oganic law. In re Crane, 27 Idaho 671, 151 Pac. Rep. 1006, L. R. A· 1918A 942; Crane v. Campbell, 245 U. S. 304, 62 L. Ed. —, 38 Sup. Ct. Rep. 98; Delaney v. Plunkett, 146 Ga. 547, 91 S. E. Rep. 561, L. R· A. 1917D 926; Barbour v. State, 146 Ga. 667, 92 S. E. Rep. 70, affirmed. by United States Supreme Court, April 14th, 1919, State of Utah v. Certain Intoxicating Liquors and Otto Me. ks, — Utah ——, 172 Pac. Rep. 1050, L· R. A. 1918E 943; State ex rel. Hermain v. Ross, — N. D. —.., 170 N. W. Rep. 121; Brennen v. Southern Exp. Co., —— S. C· —, 90 S. E. Rep. 402; State v. Carpenter, —.., N. C. --—, 92 S. E. Rep· 373; City of Seattle v. Broobins, — Wash. —.., 167 Pac. Rep. 940; State v. Fabbri, — Wash. —.., 167 Pac. Rep. 133; Ex parte Zwissig, — Nev. ........, 178 Pac. Rep. 20; State v. Brown, — S· D. —.., 167 N. W. Rep. 400; Fitch v State, — Neb. —.., 167 N. W. Rep. 417; Southern Exp. Co. v. Whittle, 194 Ala. 406, 69 South. Rep. 652, L. R. A. 1916C 278; People v. Blanchard, 174 N. Y. Supp. 276; Glenn v. Southern Exp. Co., 170 N. C. 286, 87 S. E. Rep. 136; State v. Sixo, 77 W· V. 243, 87 S. E. Rep. 267; State v Tincher, supra; Longmire v. State, 75 Tex. Cr. App. 616, 171 S. W. Rep. 1165, Ann. Cas. 1917A 726; Liquor Transportation Cases, —.. Tenn. —.., 205 S. W· Rep. 423; Schmitt v. Cook Brewing Co. — Ind. —.., 120 N. E. 19; State v. Macek, — Kans. —.., 180 Pac. Rep. 985.

If the organic rgiht of "enjoying and defending life and liberty," is subject, as it is undoubtedly is, to statu-

tory regulation even to the infliction of capital punish
ment, without a provision of the constitution permitting
it, then certainly the right of "acquiring possessing and
protecting property," in intoxicating liquors is subject to
statutory regulation, when the constitution itself forbids
the manufacture, sale, barter or exchange of such liquors,
and mandatorily requires the enactment of *suitable laws*
for the enforcement of the ordained prohibitions·

As the elgislature is·commanded by the constitution to
"enact suitable laws to enforce" the prohibitions contained
in Article XIX, the legislature and not the judiciary de-
termines whether a statute enacted for that purpost is a
"suitable law" when it has a real relation to the subject
of Article XIX.

The statute involved here, regulating he possession of
intoxicating liquors, obviously has a real relation to' the
subject and object of Aritcle XIX, therefore, it manifest-
ly is a "suitable law" within the command of the consti-
tution, and being authorized by the constitution it does
not violate the organic right to possess property.

As the provision of the statute here involved merely
regulates and does not forbid entirely the possession. of
intoxicating liquors, it does not add to the prohibitions
defined in the constituion, but only operates to enforce
the organic prohibitions as expressly required by Article
XIX.

The information does not allege that the liquors were
in the possession of the defendants prior to the adoption
of Amended Article XIX, or the enactment of Chapter
7736, Acts of 1918, Special Session, or prior to January
1,1919, when Article XIX of the constitution and the stat-
ute *became effective.* Whether that would present a ma-

terial question is not considered here.  See Barbour v. State of Georgia, decided by the United States Supreme Court, April 14, 1919.  Even if some portions of Chapter 7736, Acts of 1918, Special Session, are unconstitutional, the provision of the statute here involved is not affected thereby, it being the express purpose of the legislature that the valid portions of the statute shall be enforced though other portions be invalid.  Sec. 22, Chap. 7736, Acts of 1918, Special Session.

The decisions in Kentucky and other States contrary to the views here expressed are apparently controlled by peculiar restrictive provisions in the constitutions of these States, or as in Alabama, North Carolina, Texas, West Virginia, and other States have been superseded by the above cited later decisions in those States.

Affirmed.

WEST, J., concurs.

ELLIS, J., concurs in conclusion.

BROWNE, C. J., AND TAYLOR, J., dissent.

ELLIS, J., concurring.—I concur in the conclusion reached in the opinion of Mr. Justice WHITFIELD, for the following reasons: The phrase "inalienable rights" and the words "acquiring," "possession," "protecting," "property," as used in the first section of the Declaration of Rights of the Constitution of 1885, are not terms which express a single, definite, unqualified meaning.  Their meaning is subject to certain qualifications.  "Inalienable" for instance does not mean that which one cannot

be deprived of without his conesnt. The meaning more properly defines the word indefeasible. Webster's International Dictionary· The word is defined by the same lexicographer as meaning that which one cannot give away or part with even with his own consent, and yet one's life or his liberty is taken from him by the authority of the State for an infraction of a rule or regulation of society. Thus while one may not sell his life or liberty to another, he may forfeit it to the State. The word "right" as a noun is defined to be, that to which one has a "just" claim; a power, privilege, condition of existence or the like to have or enjoy which one has a natural claim; a power or privilege to which one is entitled upon principles of morality, religion, law or the like.

An inalienable right as applied to life or liberty, may mean a power, privilege or condition of existence to have or enjoy which one has a *natural* claim. Life and liberty may be a condition of existence which one may not lawfully give away or part with, but it is not such a condition of existence that he may not forfeit by an infraction of the rules of society; that he may not part with by an unlawful act. As applied to property, however, the word "right" can not with the same propriety be said to be a "condition of existence," but rather it is a power or privilege to which one is entitled upon principles of law—a just claim. The phrase "inalienable rights" therefore does not have the same meaning when applied to property as when applied to life and liberty. In the nature of things it cannot have the same meaning. In the one case the right is a *natural* claim, in the other a *just* claim resting upon principles of law. In the one case the right attaches as soon as one comes into existence; in the other it attaches when sanctioned, authorized, supported by law.

Whether the term is applied to life, liberty or property, the right which it defines yields to the superior right of the body politic and means such privilege or power to which an individual is entitled under the law.    There is no express constitutional provision for the infliction of capital punishment or imprisonment for crime, but such statutes are held to be valid.    The right in the people of enact laws for the public good is recognized by the constitution, but whether contained in the constitution or not the right cannot be denied in a democratic form of government·    So it is very evident that the words used in the constitution to define the individual's right to life and property are not words of such clear, definite, single meaning as that all persons may say this or that power, privilege or right is absolutely, unqualifiedly secured by the provisions of the constitution and announced in the Declaration of Rights.    The word "property" is a word of such doubtful meaning as that on definition which satisfactoriily answers all requirements has yet been furnished.    There have been many attempts to define the word, and it would be a work of supererogation to quote authors and decisions.    The word may be broad enough to embrace anything upon the world capable of possession, yet it is clear that it is not in that sense that the word is used in the Declaration of Rights.    One may have no property right for instance in spurious coin or illicitly distilled alcoholic liquors.    The word does ont mean anything that may be produced by cultivating the soil, working the mines, fishing in the seas or fresh waters of the earth, or that may be grown upon its surface, or manufactured by man, yet all these things occupy space, are capable of possession, may be acquired and transferred to another by barter and sale or exchange; yet there are some things which man may have no right to acquire, possess

or defend—some things which are therefore not property within the meaning of the term as used in the constitution.

Now property in the sense of the thing acquired, has certain attributes. It may be legally acquired by purchase, barter or exchange, or it may be manufactured. Indeed as was said by the court of last resort in New York: "If any one can define 'property' eliminated of its attributes, incapable of sale and place, without the protection of law, it were well that the attempt be made." See Wymehamer v. People, 13 N. Y. 378.

The word as used in the constitution so far as it applies to anything made or manufactured by man, means something that may be manufactured, bought, sold, bartered or exchanged legally, that is to say within the protection of the law· If it may not be legally be *acquired* by manufacture, purchase, barter or exchange, it cannot legally be possessed or defended. The claim therefore to the possession of anything that cannot be *legally* acquired is not a just claim. The word "acquire" as used in the Bill of Rights does ont mean "to gain by any means" as defined in Webster's International Dictionary, but it means to gain by *legal* means; that is to say by a means recognized, sanctioned and approved by law. The inalienable right to acquire, possess and defend property, therefore, means a just claim to anything that may be legally gained. But 36 gallons of alcoholic liquors could not legally acquired by one person on January 1, 1919. The constitution as amended at the election of November, 1918, forbade it. That amendment divested alcoholic liquors, a manufactured article, of the attributes of property. It could not be legally manufactured after a certain date; that is to say, it could not be legally brought

into existence on that day; it could not be purchased, bartered, sold or exchanged. It could not be legally acquired, therefore it cannot be legally possessed or defended. Being divested of the attributes of property it was without the portection of the law, and in obedience to an express command of the legislature, by Chapter 7736, Laws of 1918, enacted a law to make the amendment effective.

The argument of those who support the theory that the above mentioned Act of the legislature is unconstitutional as being in conflict with the first section of the Bill of Rights, rests upon the following syllogism:

Major:   Every man has an inalienable right to acquire, possess and defend *property*.

Minor:   36 gallons of alcoholic liquor (quantity named in information) on the 1st day of January, 1919, was *property*.

Conclusion:   Therefore on January 1, 1919, Marasso (a man) had an inalienable right to acquire, possess and defend 36 gallons of alcoholic liquors.

But the fallacy of the argument lies in the second premise.

BROWNE, C. J., dissenting.—Since this case was submitted I have devoted much time and labor and thought to it in order to reach a right conclusion, as it is given me to see the right, and if possible make my conscientious convictions square with my inclination to sustain the law which seeks to lessen the evil caused by the excessive use of intoxicating liquor. This I have been unable to do.

If the decision could be limited in its effect to intoxicating liquors it would be harmless as a precedent, as the liquor question will soon be as completely removed from political consideration as the question of slavery.

Unfortunately, however, we cannot so limit its scope, and the time is not far distant when it and the decisions by which it is supported will be authority for further inroads upon private ownership of property. We cannot blind ourselves to the socialistic conditions prevailing in other countries, and rapidly winning adherents here, whereby the rights of property and the rights of persons are ruthlessly destroyed; justified by the doctrine of public welfare.

The founders of this government knew that in times of stress and passion, the rights of property and of persons would be violated, and sought to safeguard them by constitutional provisions that seemed ample for that purpose. The Declaration of Rights found in all American constitutions, is but the iteration of the fundamental rights of a free people, without which free government cannot exist. Thus, the very first section of our constitution makes this declaration: "All men are equal before the law, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing and protecting property, and pursuing happiness and obtaining safety." Every other provision of the constitution and every law must be construed in the light of this declaration, and made subservient to it.

But the people were so jealous of these rights that they did not leave them to be protected and guaranteed by the generalization of Article 1, but ordained in Aritcle 12 of the Declaration of Rights that "No person shall * * * be

deprived of life, liberty or property without due process
of law; nor shall private property be taken without just
compensation." It cannot be contended that a legisla-
tive enactment depriving one of his property, is "due pro-
cess of law", nor does the act under consideration make
any provision for "just compensation" for the property
taken. Life and liberty may be forfeited by the State, by
"due process of law," but not by mere legislative enact-
ment, and I fail to see how a rule can be made with re-
gard to property, that does not apply to life and liberty.
It is a short step from outlawing property, to outlawing a
person, and if a legislative enactment is "due process of
law" in one instance, it is in the other.

Early encroachments on the rights of property were re-
sisted by the people, but the courts very generally sus-
tained regulations that somewhat impaired the right of
property for the general good, but distinguished between
laws reasonably regulating the use of property, and those
that destroyed all property rights. It was never intended
by these decisions to extend the power of regulation, to
the point of destruction of ownership in certain classes
of property.

Within a very recent period, laws have been enacted
whose avowed purpose was to destroy all private owner-
ship of a certain class of property, and the courts of some
of the States have sustained their constitutionality.

One of the purposes of the statute, the constitutionality
of which is here challenged, is stated in the title to be "to
declare that the right of property shall not exist in cer-
tain liquors or liquids and *certain other property.*"

Section 15 enacts "that the right of property in and to
all alcoholic liquors or beverages * * * possessed by any

person, association of persons, or corporations * * * is hereby declared not to exist in any person, association of persons, or corporation, and the same shall be forfeited."

Section 5 also provides that "nothing contained in this act shall be construed to make it unlawful for any person over the age of twenty-one years to possess, have in custody or control in such person's bona fide residence, for the personal use of himself, herself and family and not to be disposed of to any other persons, not exceeding four quarts of distilled alcoholic or intoxicating liquors or beverages or twenty quarts of malt or fermented alcoholic or intoxicating liquors or beverages, either or both."

This act took effect on the 1st day of January, 1919, and its purpose and effect was to destroy all ownership of, and rights of property in intoxicating liquors except a limited amount, regardless of the quantity or value. It is a mere matter of detail whether the law required the owner of such property to destroy it, or whether the State seized and destroyed it, because in either instance the citizen's "inalineable rights * * * of acquiring, possessing and protecting property" are destroyed by the State.

The Supreme Court of the United States in an opinion written by that great jurist Chief Justice TANEY held that "spirits and distilled liquors are universally admitted to be subjects of ownership and property." The License Cases, 5 How. (U. S. ) 504.

I do not concede that an amendment to a constitution can take away from a citizen his inalienable rights of life, liberty and pursuit of happiness, even if it should specifically purport to do so, because these rights are inherent and existed before the adoption of the constitution.

Rights that exist independent of the constitution, cannot be taken away by amendments thereto. "Although constitutions may protect and guard individual rights, such rights did not have their origin and function in these instruments.   A constitution is not the beginning of a community nor does it originate and create institutions of government.   Instead it assumes the existence of an established system which is still continued in force and is based on pre-existing rights, laws, and modes of thought. It has been aptly said that written constitutions sanctify and confirm great principles, but do not bring them into existence, and that a constitution is not the cause, but a consequence of personal and political freedom." 6 R. C. L. 18.

It is not necessary, however, to enter into this realm of discussion, because it is quite clear to me that the amendment to our constitution adopted in the general election of 1918, known as Article XIX, does not authorize the legislature to prohibit the possession and ownereship of intoxicating liquors, and to destroy all rights in and to, property owned and possessed by citizens prior to the adoption of the amendment or prior to its going into effect.

I differ from the majority of the court upon the proposition, that the doctrine *expressio unius est exclusio alterius,* does not here apply.   This contention has been so well answered by the Supreme Court of West Virginia, in the case of State v. Gilman, 33 W. Va. 146, 10 S. L. Rep. 283, 6 L. R. A. 847, that I adopt its language.   The West Virginia constitution contained a clause, that "laws may be passed regulating or prohibiting the sale of intoxicating liquors," and the legislature by its edict provided that no person without a State license therefore, should "keep in his possession for another, spirituous liquors."

The court said: "But the people,' by declaring that 'laws may be passed regulating or prohibiting the sale of intoxicating liquors,' according to the principles we have announced, imposed a restraint upon this plenary power. By granting an express authority to the Legislature to regulate or prohibit the sale, there is an implied inhibition to the exercise of any authority in respect to that subject which is not embraced in the grant. This rule is simply an application of the old maxim, *expressio unius est exclusio alterius*, which Lord Bacon concisely explains by saying: 'As exceptions strengthens the force of a law in cases not excepted, so enumeration weakens it in cases not enumerated.'

"The express power here given to regulate or prohibit the sale of liquors, unless it was intended to limit the legislative authority, would render this provision of the Constitution wholly nugatory and useless, because, as we have seen, without this provision the Legislature would have had plenary power over the whole subject. It could not only have legislated in respect to the prohibition and sale of liquors, but in all other respects. It seems to me, therefore, that the purpose and effect of this constitutional provision was and is to restrict and limit the legislative authority to the powers expressly granted therein, —that is, to the power to regulate or prohibit the sale of liquors, and, consequently, a legislative Act not within the legitimate scope of this express grant, unless it is a fair and reasonable exercise of the police power, must be held unconstitutional and void.

"From what we have already said, it is apparent that the provision of the statute under consideration is not a fair and reasonable exercise of the police power, nor has it any reference to the prohibition or sale of liquors. It

is simply an attempt to make the possession of liquor for any purpose a crime.  A very different question would be presented if the Act had made it unlawful for any person to keep intoxicating liquors in his possession, either for himself or for another, for the purpose of selling it, or as a device to evade the revenue laws."

The view thus expressed, that a command to the legislature to enact certain laws, impliedly prohibits it from legislating on the subject in other particulars, which otherwise would have been within its inherent powers, is supported by Keller v. State, (Tex. Crim. App.) 1 L. R. A. (N. S.) 489, and cases cited in note.

Aritcle 19 is not a grant of power to the legislature, but a limitation of power.  If the people had seen fit to strike Article 19 from the Constitution, instead of amending it, there is no question, but that the legislature could have prohibited the "manufacture, sale, barter or exchange of intoxicating liquors;" but it will be contended that it would also have had power to destroy property rights, or require a person to destroy his own property under pains and penalties of law?  Article 19 gave no power to the legislature that it would not have had without it.  As the amendment was not necessary as a grant of power, it is necessarily a limitation upon the legislative power.  It limited the legislature to the enactment of laws, to prevent the *manufacture, sale, barter,* and *exchange* of intoxicating liquors.

I attach no weight to the fact that Article 19 contains a clause that "The legislature shall enact suitable laws for the enforcement of the provisions of this Article." That is a mere iteration of a power inherent to the legislature to enforce by suitable laws and provision of the con-

stitution. This power is inherent in the legislature, and needs no express grant for its exercise· Section 2 of Article 19 therefore gave the legislature no power that it did not alread possess, and it cannot be invoked for such purpose.

The proposition before the legislature when it voted to submit Article 19 to the decision of the people, was whether "the *manufacture, sale, barter* or *exchange*" of intoxicating liquors should be prohibited. Prohibition of its possession or use was not voted on by the legislature; was not submitted to the people, and they did not vote on it when they voted on the amendment. There were no doubt many persons voting for the amendement who desired to prohibit the manufacture, and sale of liquor, but who held sacred the constitution of the State, and would not have voted for it, had there been anything in the proposed amendment that indicated in the slightest degree that private ownership in property was to be abolished, and property rights to be destroyed. The fact that an elector was willing to vote against the manufacture, sale, barter and exchange of intoxicating liquors does not necessariiy show that he would have been willing to vote for its confiscation when kept solely for the personal use of the owner.

Had the legislature desired to submit to the people the question of prohibiting the manufacture, sale, barter, exchange, *use and possession* of intoxicating liquors, it could have done so by prohibiting its possession only, for it is palpable that a person could not manufacture, sell, barter or exchange liquors, without first possessing them, whereas prohibiting the manufacture, sale, barter or exchange and omitting the word "possession," requires judicial sanction to produce that result. It is inconceivable that the legislature when it drafted this amendment,

should have intended to submit to the people the question whether or not the possession of intoxicating liquors should be prohibited, and have left out that very important and vital word, relying on another legislature to incorporate it into the amendment after it was adopted, or on the courts to so construe it as to add that word to it.   If it was intentionally left out, in order that the people might not know that they were voting for something that they had no notice of, the courts should not sanction such procedure.

The sovereign police power of the State is derived from the ancient prerogative of the crown, to make any edicts purporting to be for the subject's welfare; and unbridled will of the king for the public welfare, was supreme. When sovereignty passed from kings, the people were vested with the same despotic power.   When free government was established in the United States, we sought to protect the rights of property and the rights of persons from the unbridled will of the new sovereign by placing in our constitutions, limitations that were considered ample for that purpose, and until very recently the courts of this country have with great unanimity sacredly guarded these inherent rights of a free people.

In Loan Assn· v. Topeka, 20 Wall (U. S.) 655, it was said: "It must be conceded that there are such rights in every free government beyond the control of the State.   A government which recognized no such rights, which held the lives, the liberty and the property of its citizens subject at all times to the absolute disposition and unlimited control of even the most democratic depository of power, is after all but a despotism.   It is true it is a despotism of the many, of the majority, if you choose to call it so, but it is none the less a despotism.   It may well be doubt-

ed if a man is to hold all that he is accustomed to call his own, all in which he has placed his happiness, and the security of which is essential to that happiness under the unlimited dominion of others, whether it is not wiser that this power should be exercised by one man than by many.

"The theory of our governments, State and National, is opposed to the deposit of unlimited power anywhere. The executive, the legislative and the judicial branches of these governments are all of limited and defined powers.

"There are limitations on such power which grow out of the essential nature of all free governments, implied reservations or individual rights, without which the social compact could not exist, and which are respected by all governments entitled to the name."

Against such salutory doctrines, the Supreme Court of Georgia has proclaimed that the people may abolish rights of property in anything they consider inimical to the public welfare.  "But neither ownership, nor property rights, nor possession will be permitted to hinder the operation of laws enacted for the pubilc welfare.  Man possesses no right under the laws or constitutions, State or Federal, which is not subservient to the public welfare."  Barbour v. State, 146 Ga. 667, 92 S. E. Rep. 70.

There are other States that hold to the same effect.

Some have gone a long way in enacting liquor legislation, but the courts have stopped short of sustaining laws that declare that "the right of property in alcoholic or intoxicating liquors or beverages * * * possessed by any person, or corporation is hereby declared not to exist in any person, association of persons, or corporation."

In the opinion of this court, some cases are cited where this question was not presented, presumably on the assumption, that should it come before them they would follow those courts that have gone the limit. Perhaps they would; but until they do, I will not charge them with it.

In those cases the right of the legislature to invade the homes of the people, and say what they should, or should not have for their personal use, so long as they did not use it to the detriment of the rights of others, was not under consideration. In those where such right was upheld, the legislature acted under their inherent powers, and not by authority of a constitutional provision confining its action to definitely specified subjects.

The earlier Georgia decisions did not sanction the invasion of the rights of a free people to acquire and possess property, or sustain laws that destroyed private ownership therein. Thus in Fears v· State, 102 Ga. 274, 29 S. E. Rep. 463, the court said: "It has been held in several States that a law regulating or prohibiting the sale of any article deemed injurious to the public, as intoxicating liquor, does not take away any vested right of property. State v. Wheeler, 25 Conn. 290; Oviatt v. Pond, 29 Conn. 479; State v. Paul, 5 R. I. 185; Lincoln v. Smith, 27 Vt· 328; Preston v. Drew, 33 Me. 558, 54 Am. Dec. 639. In all of the States, so far as we know, police control over the sale of intoxicating liquors is exercised because of the evils attending their misuse or excessive use; and while this is true, it does not follow that they are incapable of being lawfully held in possession, or that they are not subjects over which the ownership can be exercised. On the contrary, such liquors, when not held under circum-

stances which constitute a nuisance or a penal offense, are entitled to protection as other property."

In State v. Gilman, *supra*, the court held that a stat-ute that provided that no person without a State license therefor should keep in his possession, for another, spir-ituous liquors" was unconstitutional and void. In dis-cussing the fundamental rights of free people, "to acquire and possess property of every kind" the court said: "These are inalienable and indefeasible rights, which no man, or set of men by even the largest majority can take from the citizen. They are absolute and inherent in the people, and all free governments must recognize and respect them." Continuing the court said: "The keeping of liq-uors in his possession by a person, whether for himself or for another, unless he does so for the illegal sale of it, or for some other improper purposes can by no possibility injure or affect the health, morals or safety of the public, and therefore, the statute prohibiting such keeping in possession is not a legitimate exertion of the police power. It is an abridgement of privileges and immunities of the citizens without any legal justification and therefore void."

In Commonwealth v. Smith, 163 Ky. 227, 173 S. W. Rep. 340, the court said: "The power of a State to regulate and control the conduct of a private individual is confined to those cases where his conduct injuriously affects others. With his faults or weaknesses, which he keeps to himself, and which do not operate to the detriment of others, the State as such has no concern. In other words, the police power may be called into play when it is reasonably nec-essary to protect the public health, or public morals, or public safety. The mere fact that the legislature sees fit to enact a statute ostensibly for the puropse of promot-

ing such ends is not conclusive of the question. When, therefore, the statute purporting to have been enacted to protect the public health or public morals or public safety has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the Court so to adjudge, and thereby give effect to the constitution."

It would extend this discussion far beyond reasonable limits, if I undertook to give the great volume of law that is to be found in the reports, condemning legislation of this character, and I shall not do so, but content myself with some citations from Ruling Case Law.

"The right to own liquor for one's personal use occupies a somewhat different position. Liquor is property and the subject of ownership; and furthermore this right of ownership not only is not affected by the ordinary regulatory measures directed at the sale of liquor (Henderson v. Heyward, 109 Ga. 373, 34 S. E. Rep. 590; Blunk v. Waugh, 32 Okla. 616, 122 Pac. Rep. 717), but it cannot be denied according to the prevailing view, Eidge v. Bessemer, 164 Ala. 599, 51 South. Rep. 246, 26 L. R. A. (N. S.) 394, and note; Shreveport v. Hill, 134 La. 352, 64 South. Rep. 137, Ann. Cases 1916A 283 and note; 15 R. C. L. 253.

"There is authority for the proposition that constitutional authority to forbid the sale of liquor does not warrant the legislature in forbidding one person to keep it in his possession for another, State v. Gilman, 33 W. Va. 146, 6 L. R. A. 847. And a constitutional direction to the legislature to enact local option laws impliedly prohibits that body from directly legislating on phases of the subject not covered by the constitution. For instance, where the constitution gives to the people of any locality the right to prohibit sales within its limits, the legislature can

neither forbid sales outside to be shipped into local option territory, nor make such a shipment a sale at the place of destination, nor make it unlawful to have liquor in one's possession, or to give the same to another. Com. v· Campbell, 133 Ky. 50, 24 L. R. A. (N. S.) 172; Keller v. State, (Tex.) 87 S. W. Rep. 669, 1 L· R. A. (N. S.) 489 and note." 15 R. C. L. 260.

"It has been declared obiter that since liquor may be injurious to public health and morals, the state may declare that it shall not therein be the subject of property ownership or possession. Preston v. Drew, 33 Me. 558, 54 Am. Dec. 639· This view has sometimes been regarded as deriving support from a dictum of Mr. Justice HARLAN of the United States Supreme Court that the State may prohibit the manufacture of liquor for the maker's own use as a beverage. Mugler v. Kansas, 123 U. S. 623. But it is not thought that such doctrine is likely to meet with considerable approval. Generally speaking, it is the traffic and not the liquor itself which is subject to the police power; and the property right, the privilege of the individual to acquire and use liquors to satisfy his own personal tastes and appetites, should remain inviolate. It has been held generally that the mere possession and use for such purposes are not inherently injurious to health, morals, or safety of the public; and, therefore, that legislation prohibiting such acts is not a legitimate exercise of police power, but on the contrary, is an abridgement of the privileges and immunities of the citizen without any legal justification, and, as such, void. Eidge v. Bessemer, 164 Ala. 599, 51 So· 246, 26 L. R. A. (N. S.) 394 and note; Com. v. Campbell, 133 Ky. 50, 117 S. W. Rep. 393, 19 Ann. Cas. 159 and note, 24 L. R. A. (N· S.) 1172 and note; Com. v. Smith, 163 Ky. 227, 173, S. W. 340, L. R. A. 1915D 172

and note; Shreveport v. Hill, 134 La. 352, 64 So. 137, Ann. Cas. 1916A and note. Indeed, it has ever been held that the attempt of the legislature to make the keeping of liquor by one citizen for another, in a local option territory, whether for a consideration or without a consideration, a crime violates this right of property, and is not a valid exercise of the police power. Ex parte Brown, 38 Tex. Crim. 295, 42 S. W. 554, 70 A. S. R. 743: State v. Gilman, 33 W. Va. 146, 10 S. E. 283, 6 L. R. A. 847". 15 R. C. L. 265-267.

The history of the world shows, how difficult, if not impossible it is to perpetuate free governments, and the past is strewn with their wrecks, caused sometimes by conquest, but more frequently by the growth and development of insidious doctrines, fair-seeming at first, but that later became precedents for further encroachment upon the inherent and inalienable rights of free peoples, and ending in their ultimate destruction. To preserve these rights, the spirit as well as the letter of the Constitution must be unflinchingly enforced. There is not yet in this country such sanctity for the police power, that it may say to constitutions, *Noli me tangere.*

In construing the constitutionality of legislative enactments, we seldom find a law that openly purports to violate the letter of the constitution, and if we uphold those that violate its spirit, little protection will be afforded to property and persons. "If the constitutions were narrowly construed they would furnish no safeguard against laws restraining the freedom of occupation, and of migration and settlement within the State, prohibiting organized associations, or limiting the power of individuals to acquire or dispose of property or to make contracts.

"To prevent oppressive legislation of this kind the courts must rely upon the general clauses of the constitution." Freund Police Power, pp. 13, 14.

6 Ruling Case Law, 195, 196 says, "While there are no precise limits to the police power, it is not, however, without its limitations, since it may not unreasonably invade private rights, or violate those rights which are guaranteed under either federal or state constitutions. Accordingly it is an established principle that the constitutional guaranty of the right of property protects it not only from confiscation from legislative edicts, but also from any unjustifiable impairment or abridgement of this right."

Again at page 240 and 241, we find, "The general rule is that within constitutional limits, the legislature is the sole judge as to what laws should be enacted for the protection and welfare of the people, and as to when and how the police power of the state is to be exercised· It follows that so long as an act of the legislature does not infringe upon the inherent rights of life, liberty, and property, either directly or through some limitations upon the means of living or some material right essential to the enjoyment of life, its determination as to a police regulation is conclusive upon the courts."

Chief Justice MARSHALL thus expressed the purpose of the limitations on the police power of the State: "Whatever respect might have been felt for the State sovereignties, it is not to be disguised that the framers of the constitution viewed with some apprehensions the violent acts which might grow out of the feelings of the moment; and that the people of the United States, in adopting that instrument, have manifested a determination to shield

themselves and their property from the effects of those sudden and strong passions to which men are exposed." The same is true with regard to State Constitutions.

Against these once settled principles, is placed the modern or socialistic doctrine, "But neither ownership, nor property rights, nor possession will be permitted to hinder the operation of laws enacted for the public welfare. Man possesses no right under the laws or constitutions, State or Federal, which is not subservient to the public welfare." Barbour v. State, *supra*.

In line with this is what Mr. Justice HOLMES said of police power in the case of Noble State Bank v. Haskell, 219, U. S. 104, 31 Sup. Ct. Rep. 186, "It may be put forth in aid of what is sanctioned by usage, or held by the prevailing morality or strong and preponderant opinion to be greatly and immediately necessary to the public welfare."

What Mr. Justice HOLMES calls "the prevailing moraltiy," and "strong and preponderant opinion," Chief Justice MARSHALL described as "the feelings of the moment," 'and "sudden and strong passion," which he said, "it was the intention of the framers of our constitution to shield themselves and their property from."

The right to abolish private ownership of property for the public welfare is predicated on the doctrine, that whatever a strong and preponderant public opinion regards as against the prevailing morality and inimical to the pubilc welfare constitutional guarantees are impotent to secure. This is the apotheosis of the police power, at whose feet all constitutional guarantees must humbly kneel, petitioning but not demanding, observance. Before it, the right of free speech, a free press, freedom of conscience and religious worship must yield.

The attention of the civilized globe is now centered on one of the great nations of the world whose government, conducted upon this doctrine is ruthlessly destroying life, liberty and property. There the "prevailing morality" and the "strong and preponderant opinion," is that private ownership in lands and manufacturing capital, and private wealth are inimical to the public welfare; that they produce idleness, pauperism, suffering and crime, and consequently must be abolished. These people feel as deeply on these subjects, as our people feel on the liquor question.

Their doctrine is not a new one. It was proclaimed by Karl Marx more than half a century ago, but it has recently become more insistent, and its spread threatens our own institutions. He taught that "the proletariat will use its political supremacy to wrest by degrees all capital from the bourgeoisie," and his followers advocate that "the institution of private property, that is, the right of private ownership in things tangible or intangible, is to be abolished—by indirect and peaceful means as far as convenient, but by violence so far as conducive to speed and thoroughness of the change."

It is a short step—one that will be essayed much sooner than many may anticipate—from abolishing private property in lands, manufacturing capital, railroads and other public utilities, whenever a "strong and preponderant public opinion" shall consider the public welfare demands it. When that time comes, the decision of the majority of the court in this case, and those in line with it, will will be authority for legislation alnog these lines, and they will plague those who too late seek to check further inroads upon the rights of property.

Not the least of the evils that the traffic in liquor is responsible for, in this line of decisions sustaining laws de-

structive of property and property rights, enacted in response to "strong and preponderant opinion."

The difficulty of considering this subject as an abstract proposition of constitutional law, is thus stated by an eminent writer on police power, "This phase of police supervision is not only the most common, but the moral and economical conditions, which induce its exercise, are so great and pressing, and the popular excitement attending all agitations against intemeperance, like all popular agitations, is usually so little under the control of reason, that it is hard to obtain, from those who are attempting to form and mould public opinion, any approach to a dispassionate consideration of the constitutional limitations upon the police power of the State, in their application to the regulation and prohibition of the liquor trade." Tiedman's Limitations of Police Power, p. 299.

In conclusion, I can do no better than adopt as expressive of my views the language of Mr. Chief Justice BRON·SON, in Oakley v. Aspinwall, 3 N. Y. 547, text 548, "It is highly probable that inconveniences will result from following the constitution as it is written. But that consideration can have no weight with me. It is not for us, but for those who made the instrument to supply its defects. If the legislature or the courts may take that office upon themeselves; or if, under color of construction, or upon any other specious ground, they may depart from that which is plainly declared, the people may well despair of ever being able to set a boundary to the powers of the government. Written constitutions will be worse than useless.

"Believing, as I do, that the success of free institutions depends on a rigid adherence to the fundamental law, I have never yielded to considerations of expediency in ex-

pounding it. There is always some plausible reason for the latitudinarian constructions which are resorted to for the purpose of acqiring power—some evil to be avoided, or some good to be obtained by pushing the powers of the government beyond their legitimate boundary. It is by yielding to such influences that constitutions are gradually undermined, and finally overthrown. My rule has ever been to follow the fundamental law as it is written, regardless of consequences. If the law does not work well, the people can amend it; and inconveniences can be borne long enough to await that process. But if the legislature or the courts undertake to cure defects by forced and unnatual constructions, they inflict a wound upon the constitution which nothing can heal. One step taken by the legislature or the judiciary in enlarging the powers of the government opens the door for another, which will be sure to follow; and so the process goes on, until all respect for the fundamental law is lost, and the powers of the government are just what those in authority please to call them.

I regret that I cannot concur in the decision of the majority of my brothers, but it is so far-reaching in its consequences, and so dangerous to free institutions, and according to my view, so destructive of constitutional guarantees, that I find it impossible to do so.

TAYLOR, J.—I concur fully in Mr. Chief Justice BROWNE's views and conclusions.